**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**ROBERT C.,[1]**

      **Plaintiff,**

      **v.**

**COMMISSIONER OF SOCIAL
SECURITY,**

      **Defendant.**

          **Civil Action 2:22-cv-2409
Magistrate Judge Chelsey M. Vascura**

**<ins>OPINION AND ORDER</ins>**

Plaintiff, Robert C., ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). This matter is before the Court for consideration of Plaintiff's Statement of Errors (ECF No. 14); the Commissioner's Memorandum in Opposition (ECF No. 17) and the administrative record (ECF No. 9). For the reasons that follow, the Commissioner's non-disability determination is **AFFIRMED,** and Plaintiff's Statement of Errors is **OVERRULED**.

## I. BACKGROUND

Plaintiff protectively filed SSI and DIB applications in March and April 2020 (R. 242–48, 249–58) and later alleged that he became disabled on January 15, 2020 (R. 46). Plaintiff's applications were denied at the initial and reconsideration levels before an ALJ held a hearing on

---

[1] Pursuant to this Court's General Order 22-01, any opinion, order, judgment, or other disposition in Social Security cases shall refer to plaintiffs by their first names and last initials.

October 12, 2021, and issued an unfavorable determination on November 29, 2021. That

unfavorable determination became final on May 4, 2022, when the Appeals Council denied

Plaintiff's request for review.

Plaintiff seeks judicial review of that final determination. He submits that remand is

warranted because the ALJ's residual functional capacity[2] ("RFC") determination is not

supported by substantial evidence. (Pl.'s Statement of Errors 14–16, ECF No. 14.) Plaintiff

additionally argues that the ALJ erred when soliciting testimony from a vocational expert

("VE"). (*Id*. at 12–13.) Defendant correctly maintains that Plaintiff's contentions of error lack

merit. (Def.'s Mem. in Opp'n, 4–14, ECF No. 17.)

## II.     THE ALJ'S DECISION

The ALJ issued his decision on June 9, 2022, finding that Plaintiff was not disabled

within the meaning of the Social Security Act. (R. 1022–58.) The ALJ explained that for

purposes of Plaintiff's DIB application, Plaintiff met the insured status requirements through

---

[2] A claimant's RFC is an assessment of "the most [he] can still do despite [his] limitations." 20
C.F.R. §§ 404.1545(a)(1); 416.945(a)(1).

March 31, 2002. (R. 18.) At step one of the sequential evaluation process,[3] the ALJ found that Plaintiff not engaged in substantial gainful activity since his alleged January 15, 2020 onset date. (*Id*.) At step two, the ALJ found that Plaintiff had the following severe, medically determinable impairments: residuals of a traumatic brain injury (status-post pituitary adenoma excision surgery), Cushing's disease, Addison's disease, epilepsy, osteoarthritis of the left elbow, history of cryptococcal lung abscess (status post- partial pneumonectomy), and obesity. (*Id*.) At step three, the ALJ further found that Plaintiff did not have a severe impairment or combination of impairments that met or medically equaled a listed impairment. (R. 22.)

The ALJ then set forth Plaintiff's RFC as follows:

After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) within the following parameters: He can lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently. He can sit for 6

---

[3] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. §§ 404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §§ 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

3

hours and stand and/or walk for 6 hours. He must alternate from sitting to standing or walking for 2-3 minutes after every hour, and from standing or walking to sitting for 2-3 minutes after every half hour, always with the capacity to remain on task during position changes, some of which would be covered by time off task and typical breaks. The claimant can operate foot controls with the left foot occasionally. He can operate hand controls bilaterally occasionally. He can perform overhead reaching occasionally. He can reach in other directions, handle, finger, and feel frequently. The claimant can balance (navigate uneven or slippery terrain) and climb ramps and stairs occasionally, never climb ladders, ropes, or scaffolds, stoop frequently, never kneel, never crouch, and never crawl. The claimant can never work at unprotected heights, never work in proximity to moving mechanical parts of dangerous machinery, and never operate a motor vehicle. He can work in weather frequently, in humidity and wetness frequently, in pulmonary irritants occasionally, never in extreme cold, never in extreme heat, never in vibration, and can work in no louder than moderate noise. Also, there should be no exposure to flashing, glaring or strobing lights, although typical office fluorescent lights are endurable without restriction. In addition to normal breaks, he would be off task 10 percent of time in an 8-hour workday.

(R. 25.)

At step four, the ALJ relied on testimony from a vocational expert to determine that Plaintiff was unable to perform his past relevant work. (R. 1046–47.) At step five, the ALJ again relied on VE testimony to determine that in light of his age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that Plaintiff could perform including the representative occupations of marker, routing clerk, and cashier. (R. 1048.) The ALJ therefore concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, from January 1, 2015, through the date of the ALJ's determination. (*Id*.)

### III.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by

substantial evidence, shall be conclusive . . . .”). Under this standard, “substantial evidence is defined as ‘more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.’” *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec’y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must “take into account whatever in the record fairly detracts from [the] weight” of the Commissioner’s decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).

Nevertheless, “if substantial evidence supports the ALJ’s decision, this Court defers to that finding ‘even if there is substantial evidence in the record that would have supported an opposite conclusion.’” *Blakley v. Comm’r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ’s decision meets the substantial evidence standard, “a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.” *Bowen v. Comm’r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007).

## IV.    ANALYSIS

As previously explained, Plaintiff argues that the ALJ’s RFC determination is not supported by substantial evidence and that the ALJ erred when soliciting testimony from a VE. These contentions of error are addressed in turn; both are found to be lacking in merit.

A.    The ALJ's RFC Determination

Plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence for two reasons: 1) the ALJ erred when considering physical limits opined by Plaintiff's his treating physician, Dr. Holdren, and 2) the ALJ erred when finding that Plaintiff's neurocognitive disorder was not a medically determinable impairment and that it resulted in no mental health limits. These contentions of error lack merit.

1.    Physical Limits Opined by Dr. Holdren

The ALJ did not err when considering physical limits opined by Dr. Holdren. An ALJ's RFC determination must be "based on all the relevant evidence" in a claimant's case record. §§ 404.1545(a)(1); 416.945(a)(1). The governing regulations[4] describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings. 20 C.F.R. §§ 404.1513(a)(1)–(5); 416.913(a)(1)–(5).

With regard to two of these categories—medical opinions and prior administrative findings—an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from [the claimant's] medical sources." 20 C.F.R. §§ 404.1520c(a); 416.920c(a). Instead, when evaluating the persuasiveness of medical opinions and prior administrative findings, an ALJ must consider the following factors: (1) "[s]upportability"; (2) "[c]onsistency"; (3) "[r]elationship with the claimant"; (4) "[s]pecialization"; and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an

_____

[4] Because Plaintiff's applications were filed in 2020, they are subject to regulations that govern applications filed after March 27, 2017.

understanding of [the SSA's] disability program's policies and evidentiary requirements." §§ 404.1520c(c)(1)–(5); 416.920c(c)(1)–(5).

Although there are five factors, supportability and consistency are the most important, and an ALJ must explain how he or she considered them. §§ 404.1520c(b)(2); 416.920c(b)(2). When considering supportability, the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support a medical opinion, the more persuasive the ALJ should find the medical opinion. §§ 404.1520c(c)(1); 416.920c(c)(1). When considering consistency, the more consistent a medical opinion is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the ALJ should find the medical opinion. §§ 404.1520c(c)(2); 416.920c(c)(2). And although an ALJ may discuss how he or she evaluated the other factors, he or she is not generally required to do so. §§ 404.1520c(b)2); 416.920c(b)(2). But when an ALJ "find[s] that two or more medical opinions . . . about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same, [the ALJ must] articulate how [he or she] considered the other most persuasive factors . . . ." §§ 404.1520c(b)(3); 416.920c(b)(3).

Here, it appears that a checkbox form seeking information about Plaintiff's physical limits was completed by a physical therapist on August 3, 2021, and signed by Dr. Holdren on August 12, 2021. (R. 1170.) In that form, boxes were checked indicating that Plaintiff could occasionally lift 15 pounds; frequently lift 10 pounds; stand and/or walk less than two hours during an eight-hour workday; and sit less than six hours during an eight-hour workday. (R. 1164.) In response to a question asking how evidence supported these conclusions, the following

was written: "Able to lift carry 15 # with multiple jt[5] pain. Reports standing/walking caused hip, knee, ankle, heel & toe pain. Pushing/pulling caused ankle & knee pain." (*Id.*)

Boxes on the form were also checked indicating that Plaintiff could occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl, but that he could never climb ladders/ropes/scaffolds. (R. 1165.) In response to a question asking how evidence supported those conclusions, the following was written: "Able to climb stairs safely with LE jt[6] pain. Able to climb straight ladder with supervision, but not safe independently. Single leg stance < 3 sec B. Stooping caused LB pain. Kneeling and crouching increased knee pain. Crawling caused wrist & knee pain & needed assistance getting up." (*Id.*)

In addition, boxes on the form were checked indicating that Plaintiff had no handling and fingering limits. (R. 1166.) A box was also checked indicating that Plaintiff had no reaching limits, but "UE pain"[7] had also been written next to that box. (*Id.*) No box was checked in response to a question asking if Plaintiff had feeling limits or not. (*Id.*) A box asking if no manipulative limitations had been established was left unchecked. (*Id.*) A question asking how evidence supported these conclusions was left unanswered. (*Id.*) In the remainder of the form, no boxes were checked in sections asking if Plaintiff had visual, communicative, or environmental limits, but boxes indicating that no such limits had been established were also left unchecked. (R. 1166–68.) And a section asking for information about symptoms that caused other unaddressed limits was left blank. (R. 1166–68.)

---

[5] The handwritten note is unclear and maybe indicates "jt pain" or "it pain." (R. 1164.)

[6] The handwritten note is unclear and maybe indicates "jt pain" or "it pain." (R. 1165.)

[7] The handwritten note is unclear and maybe indicates "UE pain" or "LE pain." (R. 1166.)

The ALJ considered the opinions in the checkbox form and determined that they were not persuasive. He wrote as follows:

> I find the opinions of Deanna Holdren, D.O., not persuasive (B19F). Dr. Holdren completed a residual functional capacity assessment dated August 12, 2021, wherein she offered perspective on the claimant's functional status; however, it is incomplete, e.g., several key sections of the form were left blank. For example, "unlimited" boxes are checked in three of four boxes corresponding to manipulative limitations, with the last box unchecked (B19F/4); also, the "none established" box is not checked. There is also a note for either "UE" or "LE" (apparently, upper or lower extremity) pain, without a corresponding limitation. I am unable to interpret areas that are not completed as indicating "no restriction" as some areas were noted as unlimited while others were not. To the extent that the opinion indicates the claimant has no environmental restrictions, it is inconsistent with the typical symptomatology of his medical conditions. For example, the claimant's lung condition, together with Cushing's disease, warrants pulmonary restrictions. Similarly, the claimant's seizure disorder (even though well-controlled), residuals of his traumatic brain injury, and obesity warrant limitations to exposure to extreme heat and cold, vibration, noise, and lighting (B1F/2; B2F/2; B3F; B4F/108; B13F/1; B17F/8). Additionally, Dr. Holdren's opinion appears as least partially based on the claimant's self-assessment as expressed to her rather than objective evidence, as denoted by the use of "reports" followed by restriction explanations (B19F/2). The claimant's perspective on his functionality certainly is not unimportant, but objective evidence based on physical examination, recognized testing modalities, and clinical observation of medical professionals, are primary. Dr. Holdren opined the claimant could occasionally lift 15 pounds, frequently lift 10 pounds, stand and walk for less than two hours, and sit for less than six hours in an 8-hour day, restrictions which are significantly greater than those undergirded by [the claimant's] performance during physical examinations. As the supporting explanation is based on "reports" of pain in various areas, it is inadequate to overcome the objective findings within the record.

(R. 30–31 (internal footnote omitted)).

As this discussion demonstrates, the ALJ found Dr. Holdren's opinions unpersuasive for several reasons. First, the ALJ noted that the way that the form was completed made it difficult to determine if Dr. Holdren affirmatively opined that Plaintiff did not have certain limits. (*Id.*) Substantial evidence supports that explanation—a box asking if no manipulative limitations had been established was left unchecked even though boxes indicating that Plaintiff was unlimited with regard to reaching, handling, and fingering were checked. (R. 1166.) In addition, boxes

asking if Plaintiff did, or did not, have feeling limits were both left unchecked. (*Id.*) As the ALJ also noted, although a box was checked indicating that Plaintiff was unlimited in his ability to reach, a note next to that box possibly indicated that Plaintiff had upper (or lower) extremity pain. (*Id.*) In either instance, and as the ALJ explained, that note did not further describe what, if any, reaching limits resulted from that upper (or lower) extremity pain. (*Id.*)

The ALJ also considered the supportability factor and found it lacking. The ALJ indicated that Dr. Holdren's opinions appeared to be based, at least in part, on Plaintiff's self-reports instead of objective findings. (R. 31.) Substantial evidence supports that explanation. In response to a question asking how the evidence supported opined exertional limits, a note stated that Plaintiff "[r]eports standing/walking caused hip, knee, ankle, heel & toe pain." (R. 1164.) The ALJ further explained that although Plaintiff's "perspective on his functionality" was "not unimportant," objective evidence was "primary" and that "'reports' of pain in various areas" were "inadequate to overcome the objective findings in the record" and that the exertional limits opined by Dr. Holdren were significantly greater than the limits found during physical examinations. (R. 31.)

Substantial evidence supports that explanation. The record reflects that from the January 15, 2020 onset date until July 2020, Plaintiff had no musculoskeletal complaints. During this period, Plaintiff regularly reported that he was negative for musculoskeletal issues (R. 1018, 1024, 1029), and musculoskeletal examinations found that he had a normal range of motion (R. 520, 500, 450, 440, 538, 861). In March 2020, Plaintiff had normal muscle tone, gait, coordination, and 5/5 strength throughout (R. 500.) In May 2020, Plaintiff again had normal gait and coordination. (R. 440.) In June 2020, Plaintiff's gait was intact with no imbalance. (R. 546.)

The record also reflects that Plaintiff had a pituitary adenoma removed in June 2020. (R. 1095.) After that procedure, Plaintiff was put on a steroid taper and his dosage adjusted multiple times due to complaints of generalized joint pain and difficulty sleeping. (*Id*.) In July 2020, for instance, Plaintiff complained of arthralgias (R. 1034), and in September 2020, he complained of joint pain in his knees, shoulders, ankles, and elbows (R. 1039, 1042). Nevertheless, during this period, Plaintiff was negative for joint swelling (R. 1042), he had normal range of motion and muscle tone (R. 949), and he ambulated without any apparent difficulty (R. 909). Plaintiff's steroids were increased on December 21, 2020, due to generalized joint pain. (R. 1095.) It was noted that Plaintiff's symptoms appeared to improve with higher doses. (*Id*.)

A musculoskeletal examination on December 29, 2020, found that Plaintiff had grossly normal range of motion and he had 5/5 strength throughout (R. 931); an examination on January 14, 2021, found that Plaintiff had normal range of motion and no tenderness (R. 1057). On January 19, 2021, however, Plaintiff reported that he had left elbow pain. (R. 982.) An examination of Plaintiff's left elbow found that he had a full active range of motion but with pain that was worse with resisted wrist extension and when he performed a handshake with his elbow extended. (R. 983.) Plaintiff was diagnosed with epicondylitis. (R. 985.) On January 21, 2021, Plaintiff reported that he had joint pain in his right ankle and left elbow that improved after his steroids were increased (R. 1090), but he also denied myalgias, muscle weakness, back pain, and bone pain (R. 1092). On February 1, 2021, Plaintiff reported that he was negative for joint pain or swelling, back pain, and muscle pain. (R. 1086.) That same day, an examination found that he had 5/5 motor strength with normal muscle tone and symmetrical muscle bulk. (R. 1088.) On February 10, 2021, Plaintiff reported that he was negative for musculoskeletal issues although he had some trouble sleeping because of his left arm pain. (R. 1063.)

In short, the record reflects that Plaintiff routinely reported no muscle or joint pain, and that the pain that he reportedly experienced improved when his medications were adjusted. Examinations also regularly resulted in normal musculoskeletal findings. Those generally mild objective findings led the ALJ to conclude that Dr. Holdren uncritically accepted as true Plaintiff's subjective reports when she opined more restrictive exertional limits. That was a proper basis for the ALJ to discount the supportability of Dr. Holdren's opinion. *See Bell v. Barnhart*, 148 F. App'x 277, 285 (6th Cir. 2005) (holding that an opinion based solely on a claimant's self-reported symptoms "cannot support a finding of impairment"). *See also Kaltenbach v. Comm'r of Soc. Sec.*, No. 2:20-CV-4314, 2021 WL 4738845, at *7 (S.D. Ohio Oct. 12, 2021), (finding no error where ALJ found doctor's opined absenteeism limit lacked support because, in part, it was based on the plaintiff's self-reports), *report and recommendation adopted sub nom. Kaltenbach v. Kijakazi*, No. 2:20-CV-4314, 2021 WL 5235151 (S.D. Ohio Nov. 10, 2021).

The ALJ also considered the consistency factor and found that it was lacking. In particular, the ALJ noted that a section of the form seeking information about Plaintiff's environmental limits was left blank. (R. 31, 1167.) The ALJ noted that to the extent this meant that Dr. Holdren opined that Plaintiff had no environmental limits, that opinion was inconsistent with symptoms that are typically associated with Plaintiff's lung condition, Cushing's disease, seizure disorder, residuals from his traumatic brain injury, and obesity. (R. 31.) For that reason, the ALJ incorporated into Plaintiff's RFC pulmonary limits and limits for exposure to heat and cold, vibration, noise, and lighting. (*Id*.) Therefore, to the extent the blank section of this form indicated that Plaintiff had no environmental limits, the ALJ determined that Plaintiff was in fact *more* limited than Dr. Holdren had opined.

12

Plaintiff does not expressly challenge the ALJ's supportability and consistency analyses. Instead, he argues that the ALJ erred because he was "more concerned with boxes not checked" on the form instead of the substance of Dr. Holdren's opinions. (Pl.'s Statement of Errors 16, ECF No. 14.) But as discussed, in addition to noting the confusing and incomplete way the form was completed, the ALJ discussed other considerations, including the supportability and consistency factors. (R. 26.) Plaintiff appears to have overlooked those discussions.

Plaintiff also argues that because Dr. Holdren treated Plaintiff for many years, the ALJ should have afford her opinion "greater weight" than the opinions from Dr. Owens, a medical expert who testified at the November 23, 2021 hearing. (Pl.'s Statement of Errors 14, ECF No. 14.) But as already explained, although the relationship between a medical source and a claimant is one of several factors that an ALJ must consider, an ALJ is not required to discuss it. §§ 404.1520c(b)2); 416.920c(b)(2). Instead, an ALJ is only required to discuss the supportability and consistency factors. *Id*. Here, the ALJ did just that.

Notably, although Plaintiff's challenge focuses on the ALJ's consideration of Dr. Holdren's opinion, the Court finds that the physical limits that the ALJ incorporated into Plaintiff's RFC are supported by other record evidence. For instance, the ALJ generally credited the physical limits opined by Dr. Owens, including that Plaintiff was limited to a range of light work, and the ALJ incorporated into Plaintiff's RFC the limits opined by Dr. Owens. (R. 29.) To the extent the ALJ varied from Dr. Owens' opinions, he did so by incorporating into Plaintiff's RFC additional limits such as a limit for changing positions and a 10 per cent time off-task limit, thus demonstrating that the ALJ did not unquestioningly accept Dr. Owens' opinions but instead weighed it and other record evidence. (R. 25, 29, 58–59.)

The Court, therefore, finds that the ALJ did not err when considering Dr. Holdren's opinions; the physical limits the ALJ incorporated into Plaintiff's RFC were substantially supported by the record; and the ALJ carefully and thoughtfully explained the basis for his RFC determination. Plaintiff's claim to the contrary lacks merit.

### 2.      The Neurocognitive Disorder and Mental Limits

Plaintiff also contends that the ALJ's RFC determination is not supported by substantial evidence because the ALJ "ignored" Plaintiff's "cognitive impairments" when he determined that Plaintiff could perform light work without any mental limits. (Pl.'s Statement of Errors 16, ECF No. 14.) This contention of error lacks merit.

Although unclear, Plaintiff appears to challenge the ALJ's step two determination. At step two, an ALJ must consider whether a claimant's alleged impairments constitute "medically determinable" impairments—*i.e.*, impairments that result from anatomical, physiological or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. §§ 404.1520; 404.1521. To be classified as "medically determinable," impairments must also meet the durational requirement in 20 C.F.R. § 404.1509, which provides that "[u]nless your impairment is expected to result in death, it must have lasted or be expected to last for a continuous period of at least 12 months." "If an alleged impairment is not medically determinable, an ALJ need not consider that impairment in assessing the RFC." *Jones v. Comm'r of Soc. Sec.*, No. 3:15-cv-00428, 2017 WL 540923, at *6 (S.D. Ohio Feb. 10, 2017).

If an impairment is medically determinable, however, then an ALJ must determine whether it is severe. § 404.1521. A "severe impairment" is defined as "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability

to do basic work activities." 20 C.F.R. § 404.1520(c). If a claimant has at least one severe medically determinable impairment, an ALJ must consider the limiting effects of all a claimant's medically determinable impairments, severe and not, when assessing a claimant's RFC.  20 C.F.R. § 404.1523.

Plaintiff bears the burden of proving that an impairment is medically determinable at step two. The United States Court of Appeals for the Sixth Circuit has explained, however, that the step two inquiry is "employed as an administrative convenience to screen out claims that are 'totally groundless' solely from a medical standpoint." *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (quoting *Farris v. Sec'y of Health & Hum. Servs.*, 773 F.2d 85, 90 n.1 (6th Cir. 1985)). Accordingly, a claimant's burden at step two is "a *de minimis* hurdle in the disability determination process" requiring a claimant to show only that an impairment has more than a minimal impact on his ability to perform work-related functions. *Id*. at 862. Still, an impairment must be medically determinable, severe, and of sufficient duration or there will be a finding of non-disability. 20 C.F.R. § 404.1520(a)(4)(ii).

Here, the ALJ did not ignore Plaintiff's neurocognitive impairments. Instead, the ALJ explicitly considered Plaintiff's neurocognitive disorder, determined that it did not constitute a medically determinable impairment, and further determined that it did not cause any functional limitations. (R. 20–21.) The ALJ wrote as follows:

> To this end, a medically determinable impairment of a neurocognitive disorder is not established by the record. In 2017, Mr. Spindler diagnosed Mr. Caughron with an unspecified neurocognitive disorder "based primarily on WMS-IV test scores" (B1F/5). The full-scale IQ score was 100 on this occasion, and Mr. Spindler's administration of sensorium and cognitive functioning testing revealed the claimant to be functioning in the average range of intelligence (B1F). Mr. Spindler found the claimant could recall five of five objects after five minutes, recite six digits forward, four digits backward, and four digits in ascending order (B1F/4). In 2019, Mr. Spindler again assessed average intelligence (B2F), and recorded that Mr. Caughron actively was engaged as an independent contractor doing home

improvements, helping with household chores, attending religious services regularly, caring for his lawn, watching television, having friends, shopping, caring for his children and his dog, and other similar activities leading to no diagnosis of any mental health impairment (B2F). As discussed by Dr. McCain, neuropsychological testing performed by Dr. Reiter revealed the claimant did not meet the criteria for a cognitive disorder diagnosis in 2021 (B17F/10). In fact, Dr. Reiter noted the claimant had previously undergone a neuropsychological evaluation in 2009 wherein he was noted with relatively mild symptoms from his traumatic brain injury (B17F/7) and with similar overall results. The earlier testing, per Dr. Reiter, was more notable for slight psychomotor slowing, so she surmised Mr. Caughron may have improved over time inasmuch as with limited exception, his 2021 cognitive measurements were within normal limits1 (B17F/10). Of all sub-areas analyzed, only processing speed and sustained attention were noted at the "low average" range, while six other areas (estimated IQ, learning, recall/memory, recognition, executive function, and language) were average, and two other areas (general attention and visuospatial) were "high average" (B18F/4). I note further that review of other medical records, as discussed by Dr. McCain, does not support a diagnosis of a neurocognitive disorder.

It is noted that the claimant did suffer brain trauma in 1998 and again in 2007, that unspecified neurocognitive disorder was at one time assessed, and that he endorses memory and cognitive difficulties; however, the objective record fails to support the existence of a chronic neurocognitive disorder as a medically-determinable impairment. This decision should not be interpreted to state definitively that he does not have such an infirmity, but certainly the evidence before me fails adequately to support any notable work-based dysfunction related thereto.

(*Id*. (internal footnote omitted).)

Substantial evidence supports the ALJ's step two determination. The ALJ accurately noted that James Spindler, M.S., consultatively evaluated Plaintiff on March 7, 2017, and indicated that Plaintiff had an unspecified neurocognitive disorder. (R. 377.) At that time, Mr. Spindler indicated that Plaintiff could perform most work but would likely encounter problems with complex and multi-step assignments and work that varied instead of remaining constant. (*Id*.) Nevertheless, and as the ALJ correctly noted, Mr. Spindler consultatively examined Plaintiff again on August 27, 2019, which was only five months before his alleged January 15, 2020 onset date. In August 2019, Mr. Spindler wrote that Plaintiff had "No Diagnosis." (R. 386.) Mr. Spindler also indicated that Plaintiff had no functional limits at that later date. (R. 387.)

In addition, the ALJ accurately noted that during a neuropsychological evaluation on February 11, 2021, a psychologist, Dr. Reiter, wrote that Plaintiff did not meet the criteria for a cognitive disorder diagnosis. (R. 21, 1157.) Further, the ALJ explained that a psychologist, Dr. McCain (R. 1173–76), reviewed Plaintiff's file, including Dr. Reiter 's February 11, 2021 evaluation notes (R. 21). Dr. McCain opined that based on neuropsychological testing, Plaintiff did not meet the criteria for a neurocognitive disorder diagnosis. (R. 49.) Dr. McCain further opined that Plaintiff had no functional limits that could be attributed to symptoms of a neurocognitive disorder. (R. 52.) Elsewhere in the determination, the ALJ explained that Dr. McCain's opinion was persuasive. The ALJ wrote as follows:

> Dr. McCain's opinions likewise are generally persuasive. Dr. McCain noted that neither the nature nor quality of symptoms meet the criteria for a severe impairment. She explained that a true neurocognitive disorder should demonstrate decline in functionality, but herein that neuropsychological examination revealed pre-morbid cognitive functioning to be average, and that more current testing disclosed average immediate and remote memory with high-average working, or recent, memory (17F/9), indicating a lack of support for diagnosis of any chronic cognitive disorder (17F/10). Dr. McCain further cited to additional neuropsychological testing which also establishes a lack of symptoms necessary for such condition to be medically-determinable (18F/3). Dr. McCain referenced other records which also concluded no evidence of notable cognitive deficiency, such as those from Genesis Medical Group (3F/1). I agree with Dr. McCain in that the record does not support the diagnosis of a medically determinable neurocognitive disorder as the testing for such a condition has explicitly ruled it out.

(R. 29.)[8]

In sum, the ALJ's determination that Plaintiff's neurocognitive disorder did not constitute a medically determinable impairment and that it did not result in any functional limits was supported by Mr. Spindler's 2019 consultative examination findings, Dr. Reiter's 2021 evaluation notes, and Dr. McCain's opinion.

---

[8] Plaintiff does not challenge the ALJ's assessment of Dr. McCain's opinion.

Plaintiff, nevertheless, points to a portion of a Dr. Reiter 's 2021 evaluation notes in which Dr. Reiter indicated that although Plaintiff did not currently meet the criteria for cognitive disorder diagnosis, Plaintiff "appear[ed] to have more functional problems in daily life that can be readily explained by the current testing." (Pl.'s Statement of Errors 16, ECF No. 14 (citing R. 1157).) Despite this statement, however, Dr. Reiter did not opine in this, or any other document, that Plaintiff had a neurocognitive disorder or that he had any specific functional limits because of such an impairment. (R. 1156–62.) Moreover, both Mr. Spindler and Dr. McCain affirmatively opined that Plaintiff had no such diagnosis or limits. And that constitutes substantial evidence to support the ALJ's conclusions even if other evidence could support contrary ones. *Blakley*, 581 F.3d at 406.

Plaintiff also contends that the ALJ "ignored objective medical evidence." (Pl.'s Statement of Errors 16, ECF No. 14.) Plaintiff specifically argues that an MRI in February 2020 demonstrated that he had nonspecific white matter disease, and that as a result, he experienced "trouble learning or remembering new things, a hard time with problem-solving, and slowed thinking . . . . " (*Id.*) But an ALJ is not required to "discuss every piece of evidence in the record to substantiate [his] decision."  *Conner v. Comm'r of Soc. Sec.*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004)); *see also Dykes ex rel. Brymer v. Barnhart*, 112 F. App'x 463, 467–68 (6th Cir. 2004) ("Although required to develop the record fully and fairly, an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." (citations omitted)). In any event, here, the ALJ discussed Plaintiff's 2020 MRI findings—he wrote that "[p]ituatary magnetic resonance imaging (MRI) revealed no obvious adenoma" and that a prior MRI had been "negative" as well. (R. 26 (citing R. 521).) The ALJ

also discussed Dr. Reiter's February 11, 2021 evaluations notes (R. 21), in which Dr. Reiter described the February 2020 MRI and wrote that although neuroimaging findings of white matter disease can be associated with inattention/executive functioning, Plaintiff's MRI findings were "relatively mild" (R. 1160–61, 1157). Therefore, the Court finds that the ALJ did not ignore the 2020 MRI even though the ALJ focused on pituitary-related findings from the MRI instead of white matter-related findings.

Moreover, with regard to Plaintiff's allegation that he experienced "trouble learning or remembering new things, a hard time with problem-solving, and slowed thinking," at step two, the ALJ discussed the record evidence and determined that Plaintiff had only mild limitations in his ability to understand, remember or apply information. The ALJ wrote as follows:

> The first functional area is understanding, remembering or applying information. In this area, the claimant has mild limitation. Mr. Caughron has reported some issues remembering things; for example, during his first consultative examination with James Spindler, M.S., on March 17, 2017, he described having memory problems making it difficult to find a job he could do (B1F/3). Mr. Spindler found the claimant's sensorium and cognitive functioning appeared in the average range of intelligence at that first examination, noting he recalled five of five objects after five minutes, recited six digits forward, and provided correct word definitions (B1F/4). In addition, Mr. Caughron disclosed participation in playing computer and board games, driving, performing household chores, using and tinkering with a ham radio, and watching television (B1F). During a later appointment, on August 27, 2019, Mr. Spindler found the claimant appeared to be functioning at the average range of intelligence compared with others his age (B2F/4). At that time, the claimant was noted to recall three of five objects after five minutes as well as five digits forward, to count change accurately, and to provide historical information (B2F/4). Mr. Caughron also, on October 29, 2020, underwent yet another consultative psychological examination, this time with Regina McKinney, Psy.D. On this occasion, he stated that he had received average grades in school. Sensorium and cognitive functioning were measured as revealing intellectual capacity within normal limits (B12F). The claimant endorsed forgetfulness, but reported activities requiring a level of concentration and memory such as playing video games, watching television, and completing "small handyman tasks." (B12F/3). A neuropsychological evaluation was conducted by Katherine Reiter, Ph.D., on February 11, 2021, at which the claimant demonstrated average memory on testing (B18F/7). Treatment notes from Robert S. Brenner, M.D., report that Mr. Caughron "admits he is forgetful but knows a lot of details" (B13F/2).

19

(R. 19–20.) The Court finds that this discussion accurately describes the record evidence, including objective test results finding that Plaintiff functioned in the average (R. 375, 385) or normal (R. 909) range of intelligence and that he had normal memory (R. 1161).

The Court further notes that even though Plaintiff had only mild limits in this domain, the representative jobs identified by the VE as ones that could be performed by a person with Plaintiff's RFC were all unskilled positions with an SVP of 2. (R. 80.) The VE further testified that a person with Plaintiff' RFC who was also unable to engage in complex tasks could also perform those jobs. (*Id*.) Therefore, even if Plaintiff had more than mild limits in understanding, remembering, or applying information, and he was restricted to simple or non-complex tasks, it does not appear that the outcome would be different.

Accordingly, the Court finds that the ALJ did not commit reversible error when determining that Plaintiff's neurocognitive disorder was not a medically determinable impairment and that he had no functional limits because of it. Plaintiff's argument to the contrary lacks merit.

### B.    The ALJ's Solicitation of VE Testimony

Plaintiff additionally contends that the ALJ by relying on testimony from a VE to find that he could perform work that existed in significant numbers in the national economy. (Pl.'s Statement of Errors 12–3, ECF No. 14.) This contention of error lacks merit.

At step five, an ALJ must consider a claimant's RFC, age, education, and work experience to see if the claimant "can make an adjustment to other work" that exists "in significant numbers in the national economy." 20 C.F.R. §§ 416.960(c); 404.1560(c). The burden for establishing that "other work" exists in significant numbers in the national economy rests with the Commissioner, not the claimant. *Id*. To meet that burden, the Commissioner must make

a finding "'supported by substantial evidence that [Plaintiff] has the vocational qualifications to perform specific jobs.'" *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *O'Banner v. Sec'y of Health, Educ. & Welfare*, 587 F.2d 321, 323 (6th Cir. 1978)). "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question." *Id*.

When an ALJ relies on a VE's testimony in response to a hypothetical question, that hypothetical question must accurately portray a claimant's limitations. *See Ealy v. Comm'r of Soc. Sec*, 594 F.3d 504, 516-17 (6th Cir. 2010). Here, Plaintiff argues that the hypothetical question posed to the VE did not accurately portray his limitations because the ALJ's RFC determination was not supported by substantial evidence. As already explained, however, Plaintiff's challenges to the ALJ's RFC determination lack merit. For that reason, his challenge to the accuracy of the ALJ's hypothetical question—which accurately conveyed the RFC assessed by the ALJ—also fails. (R. 25, 78–79.)

## V.    CONCLUSION

For all the foregoing reasons, the Court **AFFIRMS** the Commissioner's non-disability determination and **OVERRULES** Plaintiff's Statement of Errors.

**IT IS SO ORDERED.**

/s/ *Chelsey M. Vascura*
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE